IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 23, 2013

## STATE OF TENNESSEE v. ALBERT LAMONT BENNETT, JR.

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2007-C-2315    Monte Watkins, Judge**

**No. M2012-01003-CCA-R3-CD - Filed August 28, 2013**

A Davidson County Criminal Court Jury convicted the appellant, Albert Lamont Bennett, Jr., of attempted aggravated assault and attempted aggravated burglary. The trial court sentenced the appellant as a Range III, persistent offender to ten years for each offense, to be served consecutively, for a total effective sentence of twenty years in the Tennessee Department of Correction. On appeal, the appellant challenges the sufficiency of the evidence sustaining his convictions and the sentences imposed by the trial court. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and THOMAS T. WOODALL, J., joined.

Ashley Preston(on appeal) and Matthew Mayo (at trial), Nashville, Tennessee, for the appellant, Albert Lamont Bennett, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Roger Moore and Hugh Ammerman, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The Davidson County Grand Jury returned a multi-count indictment, charging the appellant with the robbery of Lutishia Eubanks, the aggravated assault of Betty Majors, and the attempted aggravated burglary of Eubanks's residence. The appellant was convicted of

attempted aggravated assault and attempted aggravated burglary but was found not guilty of the robbery of Eubanks.

At trial, Betty Majors testified that in the early morning hours of March 31, 2007, she was asleep in the upstairs bedroom of the apartment of her daughter, Lutishia Eubanks. Majors was awakened by Eubanks's yelling, "'You don't know me, man. I don't know you. You don't know me.'" Majors went downstairs, opened the front door, and saw the appellant kicking Eubanks "[r]eally bad." Majors said that Eubanks was on the ground at the bottom of the porch steps and that the appellant kicked her five or six more times. Majors noticed that the appellant was wearing tan, Timberland boots. Majors asked, "'Sir, what's going on?" The appellant responded by hitting Majors on the head. The blow was hard, and Majors felt that she might faint.

When Majors covered her head with her hands, the appellant "started chunking" other parts of her body, including her stomach. After one of the blows, she "bounced off" the air conditioning unit that was protruding from an apartment window. Majors said that the appellant went "back and forth" striking her then Eubanks. As he struck the women, the appellant called them "[b]ad names" and said, "'I am going to kill you, M-F."

Majors said that she feared the appellant would kill her and Eubanks. Majors almost lost consciousness, felt faint, and saw "little dots going across [her] eyes." Majors estimated that on a scale from one to ten, her level of pain was ten. Majors pleaded with the appellant to stop hurting them, but her plea had no apparent effect on the appellant. Majors said the appellant did not seem drunk, but he seemed "really mean or really mad about something." Majors said that the appellant kicked Eubanks "in the head, stomach and breast . . . anywhere he could." The appellant struck Majors at least fifteen times. Majors estimated that the attack lasted twenty or thirty minutes. The attack ended when a neighbor, Robert Hill, told the appellant to stop hitting Majors. The appellant then walked over to Hill and struck him.

Majors said that as she was trying to help Eubanks, Monique Thomas approached them and told the appellant, "'Man, that's that girl's mother. She's an older lady. Don't hit that lady.'" The appellant approached Thomas, saying, "'I am going to kill you, too.'" Thomas ran into Eubanks's apartment, locked the front door, and left through the back door.

Majors said that about fifteen or twenty minutes after the attack, the police apprehended the appellant, placed him in the back of a police cruiser, and brought him to Majors and Eubanks. They identified him as the person who attacked them. While in the police cruiser, the appellant "was hollering and raging and had his head all down. And he was saying, 'I'm going to kill all these M-Fs.'"

Majors said that neither she nor Eubanks gave the appellant permission to enter the residence. She denied knowing the appellant prior to the attack.

On cross-examination, Majors said that she did not bleed after the assault and that she did not go to the hospital that night because she "wanted to make sure that [she] got a warrant on this guy because [she] was thinking he may come back or anything." Majors saw her doctor on April 12, thirteen days after the offense. She saw a nurse practitioner before April 12 and also called her doctor, who "called [her] in some medication."

On redirect examination, Majors stated that as a result of the assault, she still had a knot on her head and had to wear a wig because having her "hair done" was painful. She said that she also had problems with her hip. Majors said that immediately after the attack, Eubanks's left eye "looked like it was downward," and her eyes were bloodshot. The next day, Eubanks's bruises were visible, and "she looked bad." However, Eubanks would not go to the doctor "because she is not a doctor-going person."

Majors said that before the attack, Eubanks had cashed her paycheck for over five hundred dollars and that the money was on the ground during the attack; however, afterward they were able to recover only fourteen or fifteen dollars from the ground.

Lutishia Latrice Eubanks testified that on March 31, 2007, she was living in an apartment at 6 University Court. The apartment had a front porch with three steps leading to the ground.

Eubanks said that she went outside when she heard Thomas calling her name. Robert Hill was sitting on the end of Eubanks's porch, and Thomas was standing on the sidewalk by the steps. The appellant approached the porch, grabbed the top of Eubanks's shirt and the top pocket of her pants, "smashed [her] off [her] porch and started hitting and kicking [her] and stomping [her]." Hill walked away when the attack began. Eubanks could not remember how many times the appellant struck her with his closed fists. The appellant was wearing boots and kicked Eubanks several times, leaving footprints on her arm that were still present when she testified at the preliminary hearing. Eubanks said that the appellant screamed, yelled, and cursed as he was striking her. As a result of the attack, Eubanks's nose was injured, and she could not see out of her eye for several weeks. The injury to her eye "hurt real bad." She also had a big bruise on her arm.

Shortly after the appellant pulled Eubanks from the porch, Eubanks told the appellant, "'I don't even know you." When Majors came outside, the appellant punched her in the face then went "back and forth," alternating blows to the two women. Eubanks said that when the attack started, Hill walked away and did not speak to the appellant. However, after the

appellant attacked Eubanks and Majors, the appellant "sprung on" Hill.

Eubanks said that she had cashed a check that day and had cash on her person; after the attack, some of the cash was missing. She did not know if the appellant took the money because she tried to keep her head covered to protect herself from the attack. Eubanks had never seen the appellant before the attack. She thought the appellant appeared to be "in a rage about something."

Eubanks said that later that night, the police brought the appellant "to the drive," and she and Majors identified him as the perpetrator.

Minnie Monique Thomas testified that in the early morning hours of March 31, 2007, she was walking from her grandmother's house and saw the appellant "sitting in the backyard." Thomas talked with the appellant briefly then walked away and bought drugs from her cousin, Mario. Afterward, the appellant approached and "snatched" the money from Mario. Thomas told the appellant, "'You can't be snatching that man's money like that.'" The appellant grabbed Thomas, threw her on the ground, and "stomp[ed]" her. Thomas said that the appellant was wearing boots or flat shoes.

Thomas said that the appellant struck her several times before she was able to escape to Eubanks's apartment and call the police. The appellant chased Thomas and attempted to get into the apartment. Majors came out of the apartment just before Thomas went inside and locked the door. Thomas saw the appellant repeatedly strike Majors and Eubanks with his fists and feet. Thomas said that Hill was standing in the area and that the appellant hit Hill. Thomas thought that the appellant was intoxicated and that he was mean.

Thomas said that she called 911 and exited the apartment by the front door. She saw the appellant walk away. Thomas followed him, telling the 911 dispatcher where the appellant was going. During the call, Thomas told the 911 dispatcher that the appellant had "sto[mped her] for nothing." Thomas said that she saw the police apprehend the appellant in an alley.

On cross-examination, Thomas said that when she knocked on the door of Eubanks's apartment and asked to use the telephone, Eubanks gave her the telephone. The appellant was behind Thomas. The appellant did not say anything, but Thomas felt threatened. Thomas went inside the apartment and "hooked the screen [door]. [The appellant] was jacking on the screen" door "trying to get in." Eventually, the appellant stopped and walked off the porch. Thomas said that she saw the appellant take money out of Eubanks's pocket. Thomas acknowledged that she was high on cocaine at the time of the offense; however, she maintained that she "knew what was going on, too."

The appellant chose not to testify, and the defense presented no proof.

The jury found the appellant guilty of the lesser-included offense of attempted aggravated assault and of the charged offense of attempted aggravated burglary. He was found not guilty of the robbery of Eubanks. The trial court sentenced the appellant as a Range III, persistent offender to ten years for each offense, to be served consecutively, for a total effective sentence of twenty years in the Tennessee Department of Correction.

No motion for new trial was initially filed, and no direct appeal was taken. Thereafter, the appellant was granted post-conviction relief in the form of a delayed appeal. In this delayed appeal, the appellant challenges the sufficiency of the evidence, specifically contending that Major's injuries did not fall within the definition of serious bodily injury and that he did not attempt to enter Eubanks's apartment with the intention to commit an assault, and the sentences imposed by the trial court.

## II. Analysis

### A. Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proved, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

Tennessee Code Annotated section 39-14-402 provides:

> (a) A person commits burglary who, without the effective consent of the property owner:
>
> (1) Enters a building other than a habitation (or any portion thereof) not open to the public, with intent to commit a felony, theft or assault;
>
> (2) Remains concealed, with the intent to commit a felony, theft or assault, in a building;
>
> (3) Enters a building and commits or attempts to commit a felony, theft or assault

Aggravated assault as charged in the indictment occurs when a person intentionally or knowingly commits an assault and causes serious bodily injury to another. Tenn. Code Ann. § 39-13-102(a)(1)(A)(i). A person commits assault when the person "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." Tenn. Code Ann. § 39-13-101(a)(2). Serious bodily injury is defined as a bodily injury that involves:

> (A) A substantial risk of death;
>
> (B) Protracted unconsciousness;
>
> (C) Extreme physical pain;
>
> (D) Protracted or obvious disfigurement;
>
> (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or
>
> (F) A broken bone of a child who is eight (8) years of age or less.

Tenn. Code Ann. § 39-11-106(a)(34); see also State v. Michael Farmer, 380 S.W.3d 96, 101-02 (Tenn. 2012).

A criminal attempt occurs when a person acting with the kind of culpability otherwise

required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3).

Regarding the appellant's conviction for the attempted aggravated assault of Majors, the appellant argues that the State failed to prove that Majors suffered "serious bodily injury." The State responds that the appellant was convicted of the *attempt* to commit an assault and cause serious bodily injury and that the jury could find that the appellant tried to inflict serious bodily injury on Majors. We agree with the State. At trial, Majors testified that during a twenty- or thirty-minute ordeal, the appellant repeatedly struck her in the head and stomach with a closed fist and threatened to kill her. After the attack, she had a "knot" on her head that was so painful she could not style her hair and had to wear a wig. She stated that on a scale from one to ten, the pain she experienced was ten. Additionally, during the attack the appellant threatened to kill Majors. From the foregoing, the jury could have concluded that the appellant intended to inflict serious bodily injury on Majors. Therefore, we conclude that the foregoing evidence was sufficient to sustain the appellant's conviction for attempted aggravated assault. See State v. Davis, 354 S.W.3d 718, 731 (Tenn. 2011); State v. Bradfield, 973 S.W.2d 937, 948 (Tenn. Crim. App. 1997).

We note that as part of his sufficiency argument, the appellant also argues that the trial court erred by instructing the jury regarding the lesser-included offense of attempted aggravated assault. He concedes that it is a lesser-included offense but maintains that the only proof was of a completed crime as opposed to an attempt. The appellant did not cite to the record or provide authority in support of this argument. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); see also Tenn. R. App. P. 27(a)(7).

Accordingly, this issue is waived.

Regarding the appellant's conviction for the attempted aggravated burglary of Eubanks's apartment, the appellant argues that there was no evidence that he intended to "enter the residence in question and commit an assault therein." The State responds that the evidence is sufficient. We agree with the State.

At trial, Thomas testified that when she told the appellant to stop hitting Majors, the appellant approached Thomas and threatened to kill her. Thomas ran into Eubanks's apartment and locked the door. The appellant followed her. The appellant "jack[ed] on the screen" door to see if it would open. Thomas feared the appellant would get into the apartment and follow through with his threats. We conclude that the foregoing evidence was sufficient to sustain the appellant's conviction for attempted aggravated burglary. See Bennett v. State, 530 S.W.2d 788, 791 (Tenn. Crim. App. 1975).

B. Sentencing

The appellant challenges the length of the sentences imposed by the trial court and the imposition of consecutive sentencing. In conducting its sentencing review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Bise, 380 S.W.3d 682, 697-98 (Tenn. 2012). The burden is on the appellant to demonstrate the impropriety of his sentence(s). See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

We note that under the 1989 Sentencing Act, appellate review of the length, range, or manner of service of a sentence was de novo with a presumption of correctness. See Bise, 380 S.W.3d at 693; Tenn. Code Ann. § 40-35-401(d). However, in 2005, in response to Blakely v. Washington, 542 U.S. 296 (2004), our legislature passed amendments to the Sentencing Act to ensure that Tennessee's sentencing scheme could withstand Sixth Amendment scrutiny. See State v. Carter, 254 S.W.3d 335, 342-43 (Tenn. 2008). Thereafter, our supreme court revisited the standard of review to be applied to sentencing determinations and held that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" Bise, 380 S.W.3d at 708. Additionally, our supreme court has held that

"the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012).

However, since the 2005 Amendments to the Sentencing Act, our supreme court has not ruled upon the standard of review to be utilized when reviewing a trial court's imposition of consecutive sentencing. See State v. Jeremy J. Edick, No. W2012-01123-CCA-R3-CD, 2013 WL 3130953, at *9 (Tenn. Crim. App. at Jackson, June 13, 2013). As such, this court has been split regarding the proper standard of review when addressing consecutive sentencing. See State v. Colton D. Whitelow, No. W2012-00527-CCA-R3-CD, 2013 WL 3291889, at *2 (Tenn. Crim. App. at Jackson, June 25, 2013).

At the sentencing hearing, the trial court determined that the appellant was a Range III, persistent offender. Therefore, he was subject to a sentence between eight and twelve years. See Tenn. Code Ann. § 40-35-112(c)(4).

The forty-year-old appellant testified that he had previously violated probation at least twice. He acknowledged that since 1992, he had received six felony convictions.[1] He stated that he lived with his sister when he was not incarcerated. After he graduated from "Whites Creek" in 1989, he began working for United Parcel Service (UPS). He worked "[o]ff and on" for Coca-Cola, Able Restaurant Equipment Company, Mid-south Corporation, and as a law clerk for an attorney in Nashville. He was attempting to get a barber's license and could find work if he were granted an alternative sentence. The appellant said that he had "been a drug offender for the majority of [his] life." He stated that he had three children and had "new objectives in [his] life."

The appellant said that on the night of the incident, he fought at least six people. The fight started with him, Thomas, and another man. He said that Thomas "ran into these people's home. I stopped at the porch. I never – I never made an attempt – that's where it ended at. It was just a fight." The appellant claimed to be a victim and asked, "How can I not be the victim? It was six individuals against me."

The appellant said that he weighed three hundred pounds and was "in extraordinary shape." He disputed the witnesses' testimony, saying that if he had kicked and stomped them, they would have been severely injured. He said there was "a lot of pushing and shoving going on" because he did not want to get hurt. He denied using his fists and said that

_____

[1]Only five of these convictions were used to determine the appellant's offender classification. See Tenn. Code Ann. § 40-35-106(b).

the witnesses at trial had lied. The appellant said that he apologized "for being a part of the altercation" and that he wanted to get on with his life.

On cross-examination, the appellant said that he did not know why six people started fighting him. He acknowledged that he had numerous misdemeanor convictions. He also acknowledged that he did not know Majors and Eubanks before the altercation.

The trial court said that the appellant was "very fortunate in that the jury did not find him guilty of the more serious charges." The court applied four enhancement factors to both convictions: (1) that the appellant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; (3) that the offense involved more than one victim; (8) that the appellant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community; and (12) that the appellant "willfully inflicted bodily injury upon another person." Tenn. Code Ann. § 40-35-114(1), (3), (8), and (12). The court found no mitigating factors and sentenced the appellant to ten years for each conviction.

The court found that consecutive sentencing was appropriate because the appellant was a professional criminal and the appellant was an offender whose record of criminal activity is extensive. Tenn. Code Ann. § 40-35-115(b)(1) and (2). Therefore, the trial court imposed an effective sentence of twenty years.

## A. Length of Sentence

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; Carter, 254 S.W.3d at 343. Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. "[A]ppellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." Id. at 345-46. "[They are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

The appellant contests only the application of enhancement factor (12) because "there was never a determination that [the appellant] inflicted 'serious' bodily injury on anyone, or that any of the victims sustained 'serious' bodily injury." The State concedes that the trial court erred in applying enhancement factor (12). Regardless, the State maintains that the trial court correctly applied enhancement factors (1), (3), and (8). We agree with the State. We conclude that regardless of any error in applying enhancement factor (12), the trial court nevertheless correctly sentenced the appellant based upon the principles and purposes of sentencing. See Bise, 380 S.W.3d at 702; Tenn. Code Ann. §§ 40-35-102(1), (3)(A); 40-35-103(1)(B), (2), (4), (5).

## B. Consecutive Sentencing

In his brief, the appellant summarily contends that "[t]he record also does not support the trial court's ordering of consecutive sentencing." The State asserts that the trial court correctly imposed consecutive sentencing. We agree with the State.

Generally, "[w]hether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court." State v. Adams, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997). Tennessee Code Annotated section 40-35-115(b) contains the discretionary criteria for imposing consecutive sentencing. See also State v. Wilkerson, 905 S.W.2d 933, 936 (Tenn. 1995). Because the criteria for determining consecutive sentencing "are stated in the alternative[,] . . . only one [criterion] need exist to support the appropriateness of consecutive sentencing." State v. Mickens, 123 S.W.3d 355, 394 (Tenn. Crim. App. 2003).

The court imposed consecutive sentencing based upon the appellant being a professional criminal and being an offender whose record of criminal activity is extensive.

Tenn. Code Ann. § 40-35-115(b)(1) and (2). The record reveals that the appellant's previous criminal history consists of a conviction of aggravated assault, five convictions of possession of cocaine, one conviction of selling cocaine, one conviction of being a convicted felon in possession of a weapon, one conviction of criminal trespassing, one conviction of a felony "weapons offense," two convictions for a misdemeanor "weapons offense," five convictions of misdemeanor drug possession, one conviction of obstruction of a highway or other passageway, and one conviction of misdemeanor resisting arrest. Regardless of whether the trial court's decision is reviewed de novo or for an abuse of discretion, we conclude that the appellant's extensive criminal history, standing alone, justifies the imposition of consecutive sentencing. Accordingly, any error in applying the professional criminal criterion is harmless. See Tenn. R. App. P. 36(b).

### III. Conclusion

In sum, we conclude that there was sufficient evidence to sustain the appellant's convictions and that there is no reversible error in the sentences imposed by the trial court. Accordingly, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE